WYLLYS KING, Plaintiff in Error, *v.* WILLIAM H. MOON *et al.,* Defendants in Error.

1. *Practice — Trial — Appeal — Review of Evidence — Causes at Law and in Equity distinguished.*—In common law proceedings, as to questions of fact which are properly triable before a jury or before the court where the parties assent thereto, the verdict or finding will not be disturbed where there has been no misdirection; but in chancery or equitable cases the whole matter is open to review and revision both as to the law and the fact.

2. *Fraud — Presumptions in Law and Equity.*—Fraud may be presumed in equity, but must be proved at law. Therefore, courts of equity will grant relief upon the ground of fraud established by presumptive evidence, which courts of law would not always deem sufficient to justify a verdict.

3. *Fraud—Real Property— Sale of—Possession not changed after—Fact of, how far proof of Fraud.*—The fact that after sale of real estate possession was never taken, nor were acts of ownership ever exercised over the property by the vendee, would not, under the present system of registration, be conclusive evidence of fraud, but in connection with other circumstances indicating fraudulent intent is entitled to some weight.

*Error to Second District Court.*

*Abner Green*, for plaintiff in error.

I. This being a suit in equity, the District Court should have reviewed the evidence in the cause. The errors of the Circuit Court were sufficient to justify it in reversing the judgment. The issues involved in the cause having been submitted to a jury by the Circuit Court, and the jury failing to agree and having been discharged, the trial was then at an end, and the cause should have been continued. The court, therefore, had no authority to render judgment in the cause without another trial, unless the parties had in express terms waived their right to a trial and agreed to submit it to the court.

II. The chief error committed by the court was the erroneous finding of the facts; and this being an equitable proceeding, the court will reverse if the evidence did not warrant the finding. (Pipkin v. Allen, 24 Mo. 520.)

*John L. Thomas*, for defendants in error.

I. The court committed no error in deciding the case after issues were submitted to the jury and the jury failed to agree upon a verdict. Under the English chancery practice the chancellor had the undoubted right to even disregard the verdict of a jury; but our practice act has changed the common law rule to some extent. The court in our State has no right to enter judgment nor absolute verdicts. (Cochran v. Moss, 10 Mo. 416; Woodson v. McClelland, 4 Mo. 495.) But none of the cases go so far as to decide that a judge has no right to enter judgment according to the facts, if the jury has failed to agree. This was a case properly triable by the court, and neither party was, as a matter of right, entitled to have issues framed and submitted to a jury. (Morris v. Morris, 28 Mo. 114.) And the court was certainly under no greater obligation to submit issues to a second jury, after the first failed to agree, than to submit issues to the first jury. After the jury failed to agree and were discharged, then the case stood as if no issues had ever been submitted. The

court then assumed to decide the case, and the plaintiff assented to it. Therefore, if the plaintiff had a right to have issues submitted again, yet, having assented to the court's deciding the case, he thereby waived such right. The fact that William Moon remained in possession of the land after sale raises no presumption of fraud. (35 Mo. 208.)

WAGNER, Judge, delivered the opinion of the court.

This was a suit, in the nature of a bill in equity, brought by the plaintiff, King, to set aside a deed made by William H. Moon, one of the defendants, to his brother Thomas Moon, on the 27th day of December, 1860, conveying about two hundred and fifteen acres of land lying in Jefferson county. The claim to relief is based on the assumption that the conveyance was fraudulent, and made by W. H. Moon to his brother with intent to hinder, delay, and defraud his creditors. On the trial in the Circuit Court a jury was impaneled and issues framed submitting to their consideration the question of fraud. The jury, being unable to agree, were discharged, whereupon the court, of its own motion, without any new submission, proceeded to determine the cause, and found for the defendant.

The plaintiff then appealed to the Second District Court, where the judgment of the Circuit Court was affirmed, principally on the ground that the appellate court could not revise the facts, and that they had no authority to pass upon the weight of testimony. In this position the District Court unquestionably erred; they made a wrongful application of a correct principle.

In common law proceedings, as to questions of fact which are properly triable before a jury or before the court where the parties assent thereto, the verdict or finding will not be disturbed where there has been no misdirection; but in chancery or equitable cases the whole matter is open to review and revision both as to the law and the fact.

When the Circuit Court proceeded to determine the cause, after discharging the jury, the plaintiff gave his assent, but the defendants objected; but as the finding was for the defendants, and they

do not complain, we do not think the plaintiff can now interpose an objection to the action of the court.

The facts appear to be that when the conveyance was executed Wm. H. Moon was a merchant doing business in the town of De Soto, Jefferson county, and that he was in embarrassed circumstances—in fact, insolvent. About the middle of February, 1861, he made an assignment of his store, goods, and other personal property, together with about twenty acres of land, being all the property of which he was possessed, to one James P. Cape, for the benefit of his creditors. The assignee, Cape, sold the property, and realized from it about the sum of $1,500. Debts were presented against the estate, and allowed by the assignee, to an amount about equal to the said sum of fifteen hundred dollars, and were duly paid. One of the debts so presented, allowed, and paid, was a note due by Wm. H. to Thomas Moon for one hundred and ninety-nine dollars, which William H. Moon presented in person for allowance to the assignee. It also appears that, some time anterior to the assignment, Wm. H. Moon had executed a deed of trust on part of the property assigned, for one thousand dollars, to Bell, Tilden & Co., who were his creditors.

Judgments were obtained against Wm. H. Moon, as follows: One in favor of Doan, King & Co., January 19, 1863, for the sum of $445.79; one in favor of Shapleigh, Day & Co., in June, 1864, for the sum of $252.53; and also one in favor of Wm. F. Enders & Co., in June, 1864, for $356.30. These judgments were all rendered on debts due previous to the 27th day of December, 1860, the date of the execution of the deed from William to his brother Thomas, and none of them were proved up or allowed against the assigned property.

Execution was regularly issued on the judgment in favor of Doan, King & Co., and the land in controversy levied upon and sold; and King, the plaintiff in this suit, became the purchaser, and received the sheriff's deed therefor. There is only one question, and that is, whether the conveyance made by Wm. H. to his brother was fraudulent, so as to be void as to the existing and previous creditors of the former. While the law will not imply or presume fraud, yet common experience teaches that it is seldom

that any direct or positive proof can be obtained in regard to any given transaction, no matter how fraudulent it may be.

Fraud, in common with the highest crimes known to the law, is commonly made out by circumstantial or presumptive evidence. The very charge implies color and disguise, to be dissipated by *indicia* alone. (Per Cowen, J., Waterbury v. Sturtevant, 18 Wend. 353.) Fraud may be presumed in equity, but must be proved at law; therefore, courts of equity, it is said, will act upon circumstances as indicating fraud which courts of law would not deem satisfactory proofs.; or, in other words, will grant relief upon the ground of fraud established by presumptive evidence, which evidence courts of law would not always deem sufficient to justify a verdict. (Jackson v. King, 4 Cow. 207; 1 Story Eq. Jur. §§ 190–3, and cases cited; 3 Greenl. Ev. § 254.) The range of inquiry in the investigation must necessarily be very extensive and bring within its scope all the circumstances bearing upon the question.

A succinct review of the testimony will be necessary to arrive at a correct conclusion. Mr. Cape, the assignee, was sworn on behalf of the plaintiff, and testified to the facts as above set forth in regard to the assignment, and said that, at the time the assignment was made, Willam H. Moon was largely indebted, owing something like $3,000, and that about one-half that amount was allowed and paid by him; that after the date of the conveyance of the land — to-wit: on the 27th day of December, 1860 — William H. continued to reside on the same for two or three years and cultivate and use it as his own; that he raised three crops on it after the pretended sale, and then left, for fear of the soldiers, leaving his family and son Joseph on the farm. Witness lived near the place, and never knew Thomas Moon to exercise any control over the land; he had never been in possession of it; the first he heard of Wm. H. making a deed to his brother Thomas was when he was taking an invoice of the assigned goods.

George Hughes states that some time in the night of the 27th of December, 1860, after he had gone to bed and had been asleep, he was awakened by Wm. H. Moon and Thomas Moon, who

came to his house and asked him to write a deed for them. He got up and wrote the deed for them, which embraced the same land in controversy, and handed it to William H. Thomas then pulled out of his pocket a small pocket-book and handed it to William, and said: "This, and the notes, will make it all right for the land." "Yes," said William H. But the witness saw no money counted — saw no money pass between them. Thomas did not hand William any note. Witness kept the deed, and next day went to the house of William H. and took the acknowledgment of his wife. William then took the deed and kept it. Witness lived about one mile from Thomas Moon's house, and about six miles from William H. Moon's house. Thomas owned a small piece of land of about ninety acres ; was a small farmer ; never seemed to have much money, and did not raise much surplus produce on his farm. He always had money to pay his bills. He never occupied or held possession of the land he got from William.

Hiram Reppy testified that he rented the land in question from Joseph Moon (William H. Moon's son) in the fall of 1864 ; that Joseph said, at the time, that his uncle Thomas had the renting of it. Witness has lived on the farm ever since ; he never rented it of Thomas Moon, and Thomas has never been in possession of it, nor exercised any acts of ownership over it. He did pay Thomas $15 as rent, but that was not all that he owed. William H. Moon lived on the farm until 1864, when he left, leaving his family there, who remained a short time and then left, except his son Joseph, who stayed on the farm a month or so longer ; and when he left, witness took possession and has lived on it ever since, and is now in possession. The above, including the indebtedness heretofore spoken of, was substantially all the evidence introduced by the plaintiff.

The defendants, William H. and Thomas Moon, were then admitted to testify in their own behalf. Thomas Moon, one of the defendants, states that he is a defendant in the action ; that he thinks the land in question was worth about $1,000 when he bought it ; that on the 27th day of December, 1860, William H. Moon, his brother, came to his house and said he wanted to sell

his land. They talked a little while, and made a contract for the land. He agreed to give his brother Wm. H. one thousand dollars for the land. After supper they went over to George Hughes's to get him to write a deed; it was in the night when we got there; Hughes was in bed; he got up and wrote a deed for them for the land in controversy. Witness then took out his pocket-book and handed it to William H., and told him "this will make it all right for the land." "Yes," said William. Witness did not count any money at that time; he said he had counted it before he left home. Witness did not take the deed then; he left it with William to have the acknowledgment of William's wife taken the next day. He did not see the deed for one or two months afterward; left it with William for him to send and get it recorded; did not take possession of the land afterward, and has never had it in his possession. He got $400 from his father some time before he bought the land. His father gave it to him, but he could not tell how long it was before the purchase; it might have been a year. He had some money of his own; he could not tell exactly where he got all the money; he had the money by him when William came to sell him the land. He has about ninety acres of land; is a farmer; but does not generally raise much surplus produce. William H. never talked with him about selling the land, until he came to his house on the 27th day of December, 1860, when the trade was made. He did not agree with William to let him have the land back if he paid him a thousand dollars within two years, and did not agree with him to not put the deed on the record for a time. Witness had a note for $199 against his brother William when he bought the land; he did not put that in as a part of the pay for the land, because William said that he needed $1,000, as he was about to buy out his partner, E. M. Boly, and that he would pay the note to him in store goods. William afterward made an assignment for the benefit of his creditors, and he got the note allowed, and it was paid by the assignee. The note was given for a debt which had existed about a year before. When he handed the purse to William, and said "here is your money," William asked if that was the same money which they had counted before they left the house, and he

answered, "Yes." William said that he must fix up the matter that night; that he had to be at his store early the next morning. Witness was sure that it was not two months after the deed was made that he got it; he called for and got it from his brother William at De Soto. William had it recorded. He is not sure whether it was before or after the sale of the goods by the assignee that the deed was given to him; does not recollect what kind of money was paid for the land; he got none of the money from William, nor did he know that he was in embarrassed circumstances.

The deposition of William H. Moon was then introduced. He states that he sold the land to his brother Thomas, and that he paid him $1,000 for it. The reason why the deed was taken after night was because there was no person left in the store, and he was obliged to be back there the next morning. When he received the $1,000 from his brother Thomas for the farm, there was an agreement that he was to have the place back, provided he paid back the money with interest. This agreement was verbal; no obligation was entered into. He was to have the place back at any time within two years. In February, after the deed was made, he executed an assignment, for the benefit of his creditors, of all his goods and chattels. But a few days before he made the assignment he told his brother Thomas that he thought enough money could be made out of his property to satisfy the balance of his creditors, and that he might, if he saw proper, keep the land and have the deed recorded; that immediately afterward Thomas had the deed recorded; he had never done so before, because he (William) had no previous idea of having to make an assignment. He then speaks of the note for $199, and says it was paid by the assignee out of the assigned property; that he stayed on the place because he was unable to get away; that he rented the place of Thomas, and did repairing sufficient to pay for the rent. This is in substance all his testimony. On his cross-examination no new facts were elicited.

Before a transaction is declared fraudulent, the proof should be very clear and satisfactory, and inconsistent with the idea that it was entered into with honesty and good faith. Judge Napton,

in Dallam v. Renshaw, 26 Mo. 544, says: "But we have acted on the principle of giving the defendants the benefit of a construction favorable to the honesty of the transaction, when that construction would as well consist with the circumstances as a contrary one; and where doubts are entertained as to the true construction to be given to the conduct of the parties, those doubts should be resolved in favor of the defendants."

Admitting the above principle to be correct, can this transaction be sustained upon a full review of all the facts? All the witnesses concur in stating that Thomas was a man possessing limited means, and would not be very likely to have any considerable amount of ready money in his possession. He himself acknowledges that he raised scarcely any surplus for sale on his small farm, and he does not pretend to account for the purchase-money, except as to the $400, which he says was given him by his father. But a most strange and inexplicable part of the transaction is what took place at Hughes's. It seems that the brothers had had no previous understanding or arrangement about the sale or purchase of the land, and that William went to Thomas's late in the evening, when the agreement was perfected, and they then proceeded to the house of Hughes and found him asleep; they insisted upon his getting up and writing the deed, which he did accordingly. The reason assigned for this haste, and requiring the conveyance to be written at such an unseemly hour, is utterly inadmissible, because no validity was imparted to the instrument that night; it was neither acknowledged nor delivered. But, taken in connection with other acts which transpired at the house of Hughes, it has a strong tendency to develop and expose the true character of the whole arrangement.

That the pretended payment of the purchase was pre-arranged and fixed up for the occasion, to give the affair the semblance of honesty in the presence of Hughes, is so strongly inferable that any other conclusion would amount to a credulity at once ridiculous and absurd.

Thomas pulled out a small pocket-book, and said: "This and the note will make it all right." No money is seen, and in all the subsequent contests growing out of this sale no attempt is

made to account for or show what was done with either money or pretended note. But why was the payment made at that time ? The contract was not executed nor did any title pass. The deed was not acknowledged on that night, nor was it delivered; and till both of these circumstances took place it was a complete nullity.

That the matter was entered into with secrecy is apparent from the fact that William lived in the town of De Soto, and he went to another township to have the conveyance written and get a magistrate to take the acknowledgment. It was not admitted to record nor delivered till something like two months after its execution, and then when an assignment was made of the balance of the property. Moreover, the possession was never taken, nor is there any evidence that Thomas Moon has ever exercised any acts of ownership over the property. This, under our system of registration, would not be conclusive; but, considering the condition of the parties and all the circumstances surrounding this whole matter, it is entitled to some weight. Nor is the case in the least helped by the evidence of the defendants. They contradict each other in important and essential particulars, and they materially tend to corroborate the other witnesses. It is hardly credible that a man in Thomas's circumstances in life could not give some intelligible and satisfactory account of where he got the money to pay for the land, or that he would suffer so valuable a piece of property to remain in the possession of others without producing anything for his benefit, while he remained quietly on his small farm. The testimony of William accords well with the main fact that he was to retain the farm, and doubtless he would have done so had he not been hard pressed and forced to make an assignment. The deed was held in his possession for about two months; was not placed on record nor delivered; and this, too, when it is pretended he had the purchase-money in his pocket all the time. That Thomas knew William's embarrassed and insolvent condition, and that the arrangement was made with that fact in view, there can be no doubt, in my mind.

Taking all the circumstances together, the inference is convincing, the conclusion irresistible, that the transaction was simulated and fraudulent, and that the deed should be set aside.

The whole affair was the weak contrivance of men attempting to secure for the property of one of them an immunity and exemption contrary to law. *Bona fide* transactions do not need to be clothed with the extraordinary pretense of prompt payment, which is a distinguishing feature in this case, when the deed is left in the hands of the grantor, till the events happen which we may reasonably suppose were in the contemplation of the parties.

The judgment will be reversed, and judgment entered in this court for the plaintiff. The other judges concur.