**FONTENOT et al. v. WHITE et al.**

No. 14845—Opinion Filed Nov. 17, 1925.

Rehearing Denied Jan. 12, 1926.

**1. Fraud—Actual or Positive Fraud—Presumption and Proof.**

Fraud, actual or positive, includes cases of the intentional and successful employment of any cunning, deception, or artifice used to circumvent, cheat, or deceive another, and while fraud must be shown and proved at law, in equity it suffices to show facts and circumstances from which it may be presumed.

**2. Appeal and Error—Review—Sufficiency of Evidence in Equity Case.**

In a cause cognizable exclusively in a court of chancery, it is the duty of the Supreme Court to examine the whole record and weigh all the evidence, and when the judgment of the trial court is clearly against the weight of the evidence, to render or cause to be rendered such judgment as the trial court should have rendered.

**3. Cancellation of Instruments—Fraud—Sufficiency of Evidence.**

Record examined, and held, the evidence fully sustains the allegations of fraud set up in plaintiffs' petition.

(Syllabus by Ruth, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Creek County; Frank Mathews, Assigned Judge.

Action by Ofeast Fontenot and wife against W. S. White and others. Judgment for defendants, and plaintiffs bring error. Reversed, with directions.

James M. Hayes, for plaintiffs in error.

Thompson & Smith, for defendants in error.

Opinion by RUTH, C. Plaintiffs allege they are man and wife, and that Florence Fontenot is a citizen of the Creek Nation, duly enrolled as such, and was allotted certain lands in the Creek Nation, and defendants White, Casteel, and Thompson conspired with one Joe Howard, Fannie Acey, a woman by the name of "James," and two persons, to plaintiff unknown, to deprive her of her lands by fraud; that plaintiff was prior to March 23, 1921, a minor; that defendants sent Joe Howard to plaintiff's home in an automobile, and Howard stated defendants wanted to buy a part of the royalties on plaintiff's land, but she informed them she would not do anything with the lands until she had consulted her father, Lewis Rentie, who lived at Oktaha, Muskogee county; that Howard and a stranger took the plaintiffs in an automobile to the home of Fannie Acey, where Howard said his auto would not go any farther, and after a private conversation with Fannie Acey, Howard suggested the husband, Ofeast Fontenot, go with him to see Lewis Rentie, and that Florence wait their return; that that they departed on the train for Muskogee, and after spending the night, Howard, after he had taken Ofeast to the M. O. & G. depot, pretended he was very sick and could not go to Wainwright, which was near Rentie's home, and sent Ofeast on alone; that shortly thereafter, Fannie Acey's husband told Fannie she had a long distance telephone call, and upon returning from answering the long distance call, Fannie Acey told plaintiff it was from Joe Howard; that Howard and Ofeast had seen Rentie, and Rentie had said White and Casteel had been down to Oktaha to see plaintiff's father about buying part of the royalties, and that Florence should go to Sapulpa and let them have it; that Fannie Acey put Florence on the train and took her to Sapulpa to a rooming house run by the woman "James." This was on March 22nd. About three o'clock on the

morning of the 23rd, being the day Florence attained her majority, the James woman and Fannie Acey came to Florence's room and awakened her, and the James woman announced she had just come from Muskogee, and at three in the morning these women took Florence to the office of White and Casteel, and introduced her to these two defendants, who already had a writing prepared and had her sign the same, and she returned to the hotel; that on the same afternoon, the women took Florence to the office of White and Casteel, and White, Casteel, Fannie Acey, and the James woman retired to a private room, and when they returned Fannie Acey counted out $1,600, of which she gave Florence $100, and said she was going to put the balance in the bank at Muskogee. They then took plaintiff back to the house of the James woman, where they said Howard and Ofeast were waiting. Howard was there, but Ofeast was not, as Howard had come to Sapulpa after pretending to be sick, and Ofeast, after seeing Florence's father, had to walk to Yahola, the home of Fannie Acey, and the two plaintiffs never met until four days after their parting at Yahola, each looking for the other over that section of the country. Plaintiff then alleges that instead of the instrument she signed being a bill of sale for a part of the royalties, it was a warranty deed to her land; that the land was a homestead and the deed was not signed by her husband and is void under section 1143, Rev. Laws 1910, and that the mortgage executed by Casteel to Thompson on March 24, 1920, was void, and she prays cancellation of these instruments.

Plaintiffs filed their action on May 10, 1921, less than two months after the execution of the deed, and on June 8, 1921, defendants filed their general demurrer, which was by the court overruled. The journal entry of judgment recited the cause came on to be heard on demurrer on September 19, 1921, with counsel for both plaintiffs and defendants present, and the court after argument overruled the demurrer and gave defendants 20 days to answer, and on October 12, 1921, the defendants were adjudged in default, and the journal entry then recites as follows:

"And the court after considering the evidence finds that plaintiff Florence Fontenot is a Creek citizen enrolled opposite No. 764 on the newborn freedman roll as Florence Rentie."

The court then finds Ofeast and Florence were husband and wife on March 1, 1921, that the land was their homestead, that they were deprived of their land by fraud and collusion, and vacated the deed and mortgage, and quieted title in plaintiffs.

Although defendants were in court on September 19, 1921, and knew they had but until October 9, 1921, to answer, they did nothing further in the matter until February 13, 1922, when they filed a motion to set aside the judgment, in which motion they insist their demurrer should be sustained; that they were too busy in this (district court) and the superior court in the same county to answer, and one of the attorneys was ill; that they were not three times called in open court, and the judgment purports to be a default judgment; that the judgment was filed November 5, 1921, and they had no notice of this fact until February 11, 1922; that there was no allegation or proof that plaintiffs were in possession of the land, "in order that the action might be in ejectment."

Plaintiffs appeared specially and moved to strike the motion to set aside the judgment for that the court had no jurisdiction to consider the motion and set aside the judgment. The court, however, by Lucien B. Wright, judge, vacated the judgment of November 5, 1921, and on April 10, 1921, defendant Thompson filed his answer setting up that he was an innocent mortgagee; that on March 24, 1921, he loaned W. R. Casteel, $2,250, and took Casteel's note and a mortgage on the land, and prays that defendants' and plaintiffs' interests be decreed inferior to his mortgage lien. On the same day the defendants White and Casteel filed their answer consisting of general denial, and further answering, state they purchased the lands for $2,500 subject to about $1,200 taxes due and unpaid; deny conspiracy with Joe Howard, Fannie Acey, and the James woman, and allege the day after they secured the deed from Florence Fontenot, they borrowed $2,250 from Thompson and gave a mortgage on the land, and pray judgment. After reply filed, the cause was tried to the court, and judgment rendered for defendants, from which plaintiffs appealed to this court.

The first error assigned is leveled against the action of the court in vacating the judgment rendered in this case and filed November 5, 1921, and also leveled against the judgment of the trial court in holding the court had jurisdiction, under the pleadings and motion filed, to vacate the judgment. Defendants claim it was a default judgment and no evidence was introduced, but the journal entry of judgment recites "that the court after hearing all the evidence," etc.,

but we do not deem it necessary to discuss or determine this question.

The plaintiffs allege fraud and collusion and the case reeks with the most palpable fraud and collusion imaginable. Here is a Creek Indian girl, who has an allotment to tribal lands; she does not know just what day she will be 18 years of age; she had never been on a railroad train alone in her life; and never purchased a railroad ticket; never even bought her own clothing; her husband did not know the date she would attain her majority; her father and guardian knew she would be 18 in March, 1921, but did not know the date. White and Casteel were partners, trading in real estate and oil and gas leases, and Casteel testifies he had been buying up these Indian lands as soon as the allottee attained majority. He knew the exact date this girl would be 18 years of age, as he testifies he had the "rolls" in his office showing the dates of the births of the various Creek allottees. Two days before she attained her majority, Joe Howard appeared at her home with two men and an automobile and told her White and Casteel wanted to buy a part of her oil and gas royalties on her land (there being a gas and oil lease on the land). She refused to talk to them until she saw her father; they agreed to take her and her husband to the father and guardian; they travel over muddy roads on a cold rainy day to the home of Fannie Acey, who claims to be an aunt of the girl, where after a secret conference between Howard and Fannie Acey, Howard announces his car will not run any farther, and he and the girl's husband, at the suggestion of Howard, board the train for Muskogee, thence to entrain for the station nearest the home of the guardian. Howard pretends to be ill and tells the husband to go alone, and meet him, Howard, on his return; Howard then slips away to Sapulpa, where he knows Fannie Acey has taken the girl, upon a pretended telephone message from Howard that they had met the guardian in Muskogee and he had instructed the girl to sell a part of her royalties. The husband returns to Muskogee, and failing to meet Howard, walks weary miles through mud and rain to Yahola, the home of Fannie Acey, where he is informed his wife went to Muskogee to meet him. They know this to be false, but the husband, after spending the night in Fannie Acey's home with Fannie's husband, walks ten weary miles through mud and rain to his own home, and his wife arrives home at 11 p. m. on the night of March 24th, the fourth day after they had been separated. What became of the girl in the meantime? Just as soon as her husband was out of the way and the false phone message arrived, the girl was taken to Sapulpa and lodged in a negro rooming house. She was awakened at three a. m. on the 23rd day of March, 1921. She did not know she was 18 on that day, but White and Casteel did. She was taken at that hour to the office of White and Casteel, and introduced to them. Casteel denies he was present. A notary was called (he testifies he was awakened by a call from the White and Casteel office about 4 a. m., he thinks); and took her acknowledgment to an instrument she thought was a conveyance of a portion of her royalties, but which afterwards proved to be a deed to White. She received no money, but later, about 1 p. m., the James woman and Fannie Acey took the girl to the office of White and Casteel, where Casteel took James and Acey into a private room and had a conference, and then came out and counted out $1,600 to Fannie Acey and Fannie tied it up in a handkerchief. Casteel says he laid it on the table and the plaintiff counted it and put it in a satchel. They then took the girl to the negro rooming house, Fannie Acey gave the girl $100, and said she would put the balance in a bank in Muskogee for her. They then tried to get even a portion of this $100 from her by telling her they had just had a long distance call from Muskogee saying Howard and the girl's husband had gotten drunk in Muskogee and were broke and wanted them to telegraph them some money. They knew this was false, as Howard was then in Sapulpa in the James rooming house. They then told her her husband was waiting for her at Muskogee, and Fannie Acey, with the money in her possession, took the girl to the train and said she would go to Muskogee with her and deposit the money. Fannie disappeared at Tulsa, and the girl went home alone with what was left of her $100.

What is the defendants' testimony? Casteel's partner, White, was not called as a witness, neither was Joe Howard, Fannie Acey, nor the James woman. Casteel denies he was present at the meeting in his office at three or four a. m., but when he came in about ten a. m., his partner, White, told him he had made a deal for Florence Fontenot's land, but could not swing the deal, and Casteel said, "Well, I will take it off your hands." He testified he did not know the land, had never seen it, did not know the James or Acey woman, nor Joe Howard; had never seen an abstract of title, did not know the girl, Florence Fontenot, but knew she came of age on that day, as he had a copy of all the Indian rolls right there before him; did not know

what back taxes were due, that he paid $1,200 back taxes, and when this girl came in at one o'clock p. m., he had a conference in the private office with the James and Acey negroes, paid them each $300, reserved $300 for Joe Howard, making $900 commission on a $1,600 deal, and then went into the room where the girl was seated and counted out $1,600 in currency on the table, but he testifies neither Howard, James, nor Acey was in his employ, and he never had even heard of this deal. White then conveyed to Casteel. The testimony of Casteel strains the credulity of this court to the breaking point. All the evidence proves conclusively a conspiracy was formed to defraud this girl of her land; that the deed was made to White, and thence conveyed to Casteel, so that Casteel might appear as an innocent purchaser for value. His testimony is not worthy of any grave consideration by this court. We have often noted that it is the innocent bystander who is injured, and in this case if Casteel is innocent he will be no exception to the rule. The testimony as to the mortgage given to Thompson does not impress this court very favorably, nor establish the plea of "innocent mortgagee." The testimony discloses that after Casteel obtained the deed, he walked out on the street and met Thompson, and after a few minutes' conversation, Thompson pulled out his check book and loaned Casteel $2,250. Thompson testifies he did not know the parties, had never seen the land, never saw an abstract of title, knew nothing of back taxes; did not know the value of the land, did not get Casteel's note and mortgage for some days after making the loan, and further testifies that he in fact did not loan the money on the land, but loaned it to Casteel. Well, if he did not loan it on the land, but loaned it to Casteel, it will be imposing no hardship on him to cancel his mortgage and let him collect from Casteel. The note and mortgage were due in 60 days from the date thereof, and while this may not be unusual, it bears all the earmarks of a desire for a quick deal and perhaps a quick foreclosure of plaintiff's interests, if any, by an "innocent mortgagee," but as these plaintiffs filed this action before the note fell due, a foreclosure was impossible unless obtained through this action.

The trial court in rendering judgment for the defendants said:

"There are a good many things about the case that throw the keenest suspicion to my mind around the transaction. There are some witnesses absent from this court that ought to have been here, especially White. The court is bound to think that White is absent by design. White ought to have been a witness in this case. The hour at which the deed was made throws suspicion around it. There are other things that do not look good. The amount of the commission paid is enough to make the average man suspicious. A good portion of it went for commission. A straight legitimate deal doesn't pay that much commission."

Thus far we can follow the court and concur therein, but at this point our paths diverge and we cannot follow the trial court when it says:

"Upon the other hand, there must be convincing evidence of fraud. That does not appear in this case."

The evidence reveals a conspiracy and collusion to cheat and defraud the plaintiff of her property, carefully planned and executed. While the same degree of proof is not required in an equity case to establish fraud as is required in a lawsuit, we think the evidence would have been sufficient to establish gross fraud in a law action.

In Bottoms v. Neukirchner, 29 Okla. 104, 116 Pac. 434, this court said:

"Fraud must be shown and proved at law, but in equity it suffices to show facts and circumstances from which it may be presumed." See Young v. Blackert, 51 Okla. 285, 151 Pac. 1057.

We think the facts shown in the instant case fully meet the requirements and establish such fraud as calls for a reversal of the judgment.

1. Story, Equity Jurisprudence, sec. 186, lays down the rule as follows:

"Fraud, actual or positive, includes cases of the intentional and successful employment of any cunning, deception, or artifice used to circumvent, cheat or deceive another."

In Young v. Blackert, supra, this court quotes with approval Armstrong, etc., v. Lackman, 84 Va. 726, 6 S. E. 129, as follows:

"It is not safe to undertake to define what degree or kind of proof will justify a court of equity in granting relief against fraud, for the proof must satisfy the conscience of the court, and no man would deem it prudent to attempt to define the extent of that indispensable qualification in a judge or a court."

Brooks v. Garner, 20 Okla. 236, 94 Pac. 694, 97 Pac. 995, cites with approval King v. Moon, 42 Mo. 551-554, where the court says:

"While the law will not imply or presume

fraud, yet common experience teaches that it is seldom that any direct or positive proof can be obtained in regard to any given transaction, no matter how fraudulent it may be. Fraud, in common with the highest crimes known to law, is commonly made out by circumstantial or presumptive evidence. The very charge implies color and disguise, to be dissipated by indicia alone. Per Cowen, J., Waterbury v. Sturtevant, 18 Wend. (N. Y.) 353. Fraud may be presumed in equity, but must be proved at law. Therefore courts of equity, it is said, will act upon circumstances as indicating fraud which courts of law would not deem satisfactory proofs, or, in other words, will grant relief upon the ground of fraud established by presumptive evidence, which evidence courts of law would not always deem sufficient to justify a verdict. Jackson v. King, 4 Cow. (N. Y.) 207, 15 Am. Dec. 354; Story Eq. Jur. arts. 190-193, and cases cited. 3 Greenleaf, Ev. art. 254. The range of inquiry in the investigation must necessarily be very extensive, and bring within its scope all the circumstances bearing upon the question." Wimberly v. Winstock, 46 Okla. 645, 149 Pac. 238.

In concluding this opinion, we are again calling the attention of the bar to rule 7 of the Supreme Court rules, which requires counsel to cite the volume and page of the official state reports when citing cases from the courts of this state. The rule further provides that a failure to comply with this rule will render briefs subject to be stricken from the files.

This being an equity cause, it is the duty of this court to consider the whole record and weigh the evidence, and when the judgment of the trial court is clearly against the weight of the evidence, to render or cause to be rendered such judgment as the trial court should have rendered. City of Tulsa v. Purdy, 73 Okla. 98, 174 Pac. 759; City of Muskogee v. Burford, 77 Okla. 174, 186 Pac. 949; Hivick v. Turben, 77 Okla. 230, 187 Pac. 1094; Long v. Anderson, 77 Okla. 95, 186 Pac. 944.

Having examined the record, and being of the opinion that the fraud of the defendants has been fully established by the evidence and all the attendant circumstances, the judgment of the trial court is reversed, with directions to the trial court to vacate the judgment heretofore rendered, and to enter judgment for the plaintiff vacating and annulling the deed from Florence Fontenot to W. S. White and from W. S. White to W. R. Casteel, and the mortgage from W. R. Casteel to J. W. Thompson, and quieting title to the lands in the plaintiff Florence Fontenot.

By the Court: It is so ordered.

Note.—See under (1) 26 C. J. p. 1060, § 3; 27 C. J. p. 46, § 170; 12 R. C. L. p. 229; 5 R. C. L. Supp. p. 637; 12 R. C. L. p. 426; 4 R. C. L. Supp. 757. (2) 4 C. J. pp. 897, § 2867; 902, § 2871; 2 R. C. L. p. 204; 1 R. C. L. Supp. p. 442. (3) 9 C. J. p. 1256, § 195.