**Dorotha B. HOLLIMAN,**
Appellee,

v.

**ED GRIER VOLKSWAGEN, INC.,**
Appellant.

No. 48003.

Court of Appeals of Oklahoma, Division No. 2.

March 30, 1976.

Rehearing Denied April 19, 1976.

Certiorari Denied July 26, 1976.

Released for Publication by Order of Court of Appeals July 30, 1976.

**118**

Stephen G. Fabian, Jr., Oklahoma City, for appellee.

Collier H. Pate, Eagleton, Nicholson & Pate, Oklahoma City, for appellant.

BRIGHTMIRE, Judge.

According to plaintiff's evidence, Ed Grier Volkswagen, Inc. obtained possession of her car under false pretenses and refused to return it upon demand. She brought this conversion suit and received a jury award of $150 for actual damages and $3,500 more to punish the dealer. The latter appeals, assailing the judgment entered· on the verdict only insofar as it assesses punitive damages.

On May 17, 1974, plaintiff's son, Gary Clinkenbeard, drove his mother's 1973 Dodge Charger to defendant's place of business hoping to trade the Dodge for a new Volkswagen "Thing." He was unable to do so. Before leaving, however, he was sent to the used car department where a salesman offered to trade a 1973 yellow Thing for the Dodge—a Thing which was represented to be in "excellent condition" with only 10,000 miles on it. Gary ex-. pressed an interest in the trade and told the salesman that the Dodge belonged to his mother who would have to approve any deal made. The car man expressed no concern about such fact but told Gary the deal was contingent on defendant having the Dodge "appraised" over the weekend, and eventually finding a buyer for it. Gary agreed to this because he wanted to try the yellow Thing out over the weekend anyway. This objective was blocked, however, by defendant, who said he wanted to replace a "gear shift plate" on the Thing and wanted Gary to use a "demonstrator" until Monday. And he did.

Monday morning Gary returned the demonstrator, picked up the yellow Thing, and drove to another Volkswagen agency to have it checked. There he was alerted to evidence that the car had been wrecked. Further checking with an expert auto body repairman uncovered the fact that the left front end had at one time been "severely wrecked," and that later repair of the damage was "sloppy," and incomplete.

Gary called defendant's salesman who denied the Thing had been damaged. Later in the conversation, though, after being told about the results of a body repairman's examination, defendant's agent reluctantly conceded the car "had been in a minor wreck." At last Gary told him he was returning the Thing and would be picking up the Charger. This, advised the salesman, would not be possible because "he already had sold the Dodge."

Gary reported this to his mother who then called defendant, demanded her car, and was told to come to the lot the next morning. Both Gary and his mother went to the lot only to be told "there was no way we could get the Dodge back." Further effort to retrieve the Charger proved futile. Plaintiff went to a lawyer. A few days later this lawsuit was filed. Before long the car was "found," returned to plaintiff, and the amount of actual damages sought in the petition was reduced to $150. In this posture the case went to trial November 12, 1974.

The defending car company narrows the issue to be resolved by us in its brief, saying, "Thoughout this litigation, there was never any question but that the Dodge Charger was, in fact, titled in [plaintiff's] name; therefore, as a technical matter, a conversion occurred. *The only real question [is] whether or not the acts of the [defendant] were such as would entitle [plaintiff] to recover punitive damages.*" (emphasis not ours)

Defendant, of course, argues the negative side of the issue. First, it correctly observes that mere proof of conversion does not authorize an award of punitive damages, but evidence there also must be that in committing the tort the defendant has "been guilty of oppression, fraud or malice, actual or presumed." 23 O.S. 1971 § 9. Defendant's further argument, however, applying the law to the facts here, is not quite accurate. The thrust of its contention is that there is no basis for any finding other than that its agents in good faith thought Gary had authority to make a deal and transfer actual title (as distinguished from a paper title) to the Dodge; and, being motivated by a desire to help meet Gary's need for a different car, it "in good faith, attempted to [and did] make a disposition of the Dodge Charger" after it was "steam-cleaned and shampooed." "Equity," pleaded the automobile dealer, "should not allow the [plaintiff] . . . to further profit by allowing the retention of punitive damages." With this conclusion we disagree.

The argument overlooks evidence upon which the jury could base a finding that defendant's agents were not acting in good faith when they represented the VW Thing was in "excellent condition," knowing it had been severely wrecked and then poorly repaired. The jury could find further that requiring Gary to wait from Friday until Monday to drive the yellow Thing home was an artifice to impede a potential professional examination of the VW until after defendant disposed of the Dodge, in order to coerce consummation of the deal with the plea it could not get the Charger back—a finding which is inferentially fortified by defendant's further admission that over the weekend it promptly "wholesaled" the Dodge to "Executive Motors" for $2,650.

In our view such conduct resulted in more than a so-called "technical" conversion, whatever that may be—it amounted to a willful and wanton conversion of a car it knew Gary did not own, accomplished under the false pretense of needing to keep the Dodge over the weekend to have it "appraised," when in truth and fact defendant's agents knew the value of the car and knew for how much it could be quickly wholesaled. The whole transaction as related by plaintiff and her son fairly suggests oppressive overreaching on the part of defendant in a bad faith effort to gain an unfair advantage—the gist of fraud. *Fontenot v. White*, 115 Okl. 248, 242 P. 854 (1925). Thus, an ample foundation existed for the jury's award of punitive damages.

Affirmed.

BACON, P. J., and NEPTUNE, J., concur.